UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
                                :
                                :

IN RE SALOMON ANALYST WINSTAR  :         02 Civ. 6171 (GEL)
LITIGATION                          :
                                :          **OPINION AND ORDER**
                                :
                                :
------------------------------------------------------x

Ralph M. Stone, James P. Bonner, Patrick L. Rocco, and
Thomas G. Ciarlone, Jr., Shalov Stone & Bonner LLP,
New York, New York, Lead Counsel and Attorneys
for Lead Plaintiffs Robert Ahearn, Banca Intermobiliare
di Investimenti e Gestioni SGR, DRYE Custom Pallets,
Almar Sales Company, and Raymond Ashkenazie.

Martin London, Richard A. Rosen, Brad S. Karp, Eric
S. Goldstein, and Joyce S. Huang, Paul, Weiss, Rifkind,
Wharton & Garrison LLP, New York, New York;
Peter K. Vigeland, Wilmer, Cutler & Pickering, New
York, New York, for defendants Salomon Smith Barney,
Inc., Jack Grubman, Christine Gochuico, Kevin
McCaffrey, and Robert Waldman.

GERARD E. LYNCH, District Judge:

       Plaintiffs brought this action against Salomon Smith Barney ("SSB"), its research

analysts Jack Grubman and Christine Gochuico, its bond analyst Robert Waldman, and its

former chief of domestic equity research Kevin McCaffrey.  Plaintiffs allege that defendants

engaged in a scheme to defraud purchasers and sellers of stock in Winstar Communications, Inc.

("Winstar") in order to enrich themselves, by issuing and disseminating research analyst reports

on Winstar that were materially false and misleading.  In an Opinion and Order dated January 5,

2005, the Court dismissed the Complaint in this action.  See In re Salomon Analyst Winstar

Litig., 373 F. Supp. 2d 241, 248 (S.D.N.Y. 2005).  On January 21, 2005, plaintiffs moved for

reconsideration of that decision, and on January 24, 2005, plaintiffs moved for leave to amend.

In light of a decision from the Second Circuit issued after this Court's original order, see Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d Cir. 2005), the motion to reconsider the dismissal of plaintiffs' claims will be granted. Upon reconsideration, however, the Court will again grant defendants' motion to dismiss. Plaintiffs' motion for leave to amend the complaint will be denied. Since the underlying facts are set forth in the Court's prior opinion, they will not be repeated here.

**DISCUSSION**

I. Motion for Reconsideration.

Reconsideration of a decision under Fed. R. Civ. P. 59(e) is appropriate only where there is an intervening change of controlling law, newly available evidence, or the need to correct a clear error or prevent manifest injustice. Butler v. Phlo Corp., 00 Civ. 1607 (NRB), 2002 WL 1402007, at *1 (S.D.N.Y. June 28, 2002); see also Slue v. N.Y. Univ. Med. Ctr., 04 Civ. 2087 (GEL), 2006 WL 212294, at *1 (S.D.N.Y. Jan. 26, 2006); Del Greco v. CVS Corp., 354 F. Supp. 2d 381, 384 (S.D.N.Y. 2005). Though the "district court enjoys considerable discretion in granting or denying" such motions, they should not be used "to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." Anglo-Iberia Underwriting Mgmt. Co. v. Lodderhose, 282 F. Supp. 2d 126, 131 (S.D.N.Y. 2003) (citations and internal quotation marks omitted); see also Nat'l Cong. for Puerto Rican Rights v. City of New York, 191 F.R.D. 52, 53 (S.D.N.Y. 1999).

Plaintiffs request reconsideration of the Court's ruling on the issue of the statute of limitations. More specifically, they ask the Court to revisit the question of whether plaintiffs inquired into the possibility of fraud after Winstar announced that it had filed for bankruptcy protection on April 18, 2001. (P. Mem. Reconsideration at 1-2.) Based on a concession by

plaintiffs that they initiated no investigation into fraud until July 2002, the Court's initial opinion imputed knowledge of the claims as of April 18, 2001, the date on which "storm warnings" gave rise to a duty of inquiry.[1] In re Salomon Analyst Winstar Litig., 373 F. Supp. 2d at 247. This was over one year before plaintiffs filed their complaint, and therefore outside the relevant statute of limitations. See Lentell, 396 F.3d at 167-68 (explaining that the one-year limitations period for securities fraud begins to run when plaintiff obtains knowledge of the facts giving rise to the claim; that a duty to inquire arises "when the circumstances would suggest to an investor of ordinary intelligence the probability that [he or] she has been defrauded"; and that where plaintiffs with a duty to inquire fail to do so, knowledge of the facts giving rise to the action will be imputed as of the day the duty of inquiry arose (citation and internal quotation marks omitted)). Plaintiffs now attempt to "clarif[y]" that they had in fact "engage[d] in an elaborate and diligent exploration of claims following Winstar's bankruptcy in April 2001." (P. Mem. Reconsideration Reply at 2; P. Mem. Reconsideration at 2.) Therefore, they argue, knowledge of the claims should not be imputed to them until July 18, 2002. See Lentell, 396 F.3d at 168 (explaining that "if some inquiry is made," courts should "impute knowledge of what an investor in the exercise of reasonable diligence[ ] should have discovered concerning the fraud," and that "in such cases the limitations period begins to run from the date such inquiry should have revealed the fraud" (alteration in original) (citation and internal quotation marks omitted)).

Despite plaintiffs' attempt to characterize the newly alleged facts as a mere clarification, their argument is plainly an improper attempt to present facts that were not before the Court at

_____

[1] Though this Opinion and Order alters the date on which plaintiffs should be charged with inquiry notice, see infra note 8, the minor change does not affect the Court's holding with respect to the time bar.

the time of the underlying motion. Plaintiffs' amended complaint contained no indication of any investigation prior to July 18, 2002. (See Consolidated Amended Complaint ("Am. Compl.").) Nor did plaintiffs' brief in opposition to defendants' motion to dismiss contain any such indication; on the contrary, the brief states in clear terms that plaintiffs launched their investigation "[u]pon learning of the NASD probe" on July 18, 2002.[2] (P. Mem. Opposing Motion to Dismiss at 20.)

Plaintiffs cannot escape dismissal by claiming that they "had no notice that they would need to allege diligence of the type apparently demanded by the Court in connection with its limitations analysis." (P. Mem. Reconsideration at 1.) The Second Circuit has explained that "it is appropriate to require a plaintiff, resisting a motion to dismiss on limitations grounds, at least to allege that inquiry was made." LC Capital Partners, L.P. v. Frontier Ins. Group, Inc., 318 F.3d 148, 156 (2d Cir. 2003). Plaintiffs also cannot blame defendants for "never argu[ing] that plaintiffs failed to conduct an inquiry." (P. Mem. Reconsideration at 2.) Defendants specifically argued that "[p]laintiffs were on inquiry notice . . . no later than April 18, 2001" (D. Mem. Motion to Dismiss at 11) and devoted several pages to arguing that "Winstar's rapid decline and subsequent bankruptcy . . . were more than sufficient to place plaintiffs on inquiry notice of the alleged fraud." (Id. at 14; see id. at 11-17.)[3] Therefore, because plaintiffs did not put the issue of their alleged diligent investigation before the Court with defendants' original motion to

---

[2] Plaintiffs concede that this interpretation of their prior statements is "not unreasonable." (P. Mem. Reconsideration at 2.)

[3] In their Memorandum of Law in Further Support of Their Motion to Dismiss, defendants asserted that plaintiffs were required "to conduct a reasonable and diligent inquiry into the possibility of fraud" following Winstar's bankruptcy. (D. Motion to Dismiss Reply at 6.) Defendants noted that "[p]laintiffs' complaint alleges no such investigation," even though it was plaintiffs' burden to do so. (Id. at 6-7.)

4

dismiss, the newly alleged inquiry does not provide a basis for reconsideration.

Nevertheless, in light of the Second Circuit's intervening decision in Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d Cir. 2005), the Court considers it prudent to reconsider its ruling on the question of inquiry notice, at least with regard to whether the alleged "storm warnings" were sufficient to create such notice. Though plaintiffs do not rely on Lentell in their challenge to the Court's dismissal of their claims, their omission does not preclude this Court from relying on Lentell to determine whether reconsideration is warranted. See NAACP v. Acusport Corp., 216 F. Supp. 2d 59, 61 (E.D.N.Y. 2002) ("The court may act *sua sponte* and reconsider its own orders."); see also Billing v. Credit Suisse First Boston Ltd., 426 F.3d 130, 167-68 (2d Cir. 2005) ("It is well-established that 'once an issue or claim is properly before a court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.'"), quoting Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99 (1991). The plaintiffs' failure to cite Lentell in their papers is presumably attributable to the fact that the Second Circuit issued that opinion just one day before plaintiffs filed their motion for reconsideration. However, plaintiffs' failure to supplement their motion with an argument based on Lentell in the weeks and months following that decision likely reflects a recognition that, for the reasons set forth in detail below, Lentell does not, on analysis, affect the outcome of defendants' motion to dismiss.

In Lentell, the plaintiffs alleged that Merrill Lynch, through analysts such as Henry M. Blodget, issued false and misleading reports recommending that investors purchase shares of 24/7 Real Media, Inc. and Interliant, Inc., in order "to cultivate [Merrill Lynch's] investment-banking clients." 396 F.3d at 164. The Lentell plaintiffs filed their suit after an investigation by the New York Attorney General led to the public disclosure of evidence of fraud. The district

court dismissed the action as time-barred, holding that "storm warnings" had given rise to a duty of inquiry years before the suit was filed. Id. at 168; see Levitt v. Bear Sterns & Co., Inc., 340 F.3d 94, 101 (2d Cir. 2003). The alleged storm warnings in Lentell included: (1) a precipitous drop in the price of the shares at issue, despite consistent positive ratings from the defendants; (2) generic articles in the financial press about conflicts of interest at Wall Street firms and dishonest recommendations from financial analysts; and (3) articles about conflicts of interest and possible fraud that mentioned defendants, but that did not refer specifically to the companies in which plaintiffs had invested. See Lentell, 396 F.3d at 166-67, 169-71. The Second Circuit reversed the district court's conclusion that the warnings were sufficient to create inquiry notice, taking particular issue with the district court's reliance on generic financial news articles that did not mention the companies whose shares the plaintiffs had purchased:

> The articles cited by the district court strongly suggest grounds to believe that certain investment recommendations were less than candid. . . . However, . . . neither [of the companies in which plaintiffs bought shares] is mentioned in *any* article relied upon by the district court.
> . . . We do not mean to suggest that inquiry notice could never be established on the basis of non-specific public[] pronouncements, but . . . inquiry notice can be established only where the triggering data "relates *directly* to the misrepresentations and omissions" alleged. The articles cited by the district court describe the conflicted situation of Wall Street's research analysts; but evidence of the outright falsity of Merrill Lynch's investment recommendations is stray and indiscriminate at best . . . .

Id. at 171 (citations omitted).

Given that the storm warnings found insufficient for inquiry notice by the Court in Lentell closely parallel some of those on which this Court heavily relied in dismissing plaintiffs' complaint, see In re Salomon Analyst Winstar Litig., 373 F. Supp. 2d at 245-47, the Court will reconsider its prior holding. See In re Currency Conversion Fee Antitrust Litig., 361 F. Supp. 2d

237, 246 (S.D.N.Y. 2005) (explaining that one "major ground[ ] justifying reconsideration [is] 'an intervening change of controlling law'" (alterations in original) (citations omitted)); see also Lodderhose, 282 F. Supp. 2d at 131.

II.  Plaintiffs' Claims Are Time-Barred.

Reconsidering the issue of inquiry notice in light of Lentell's teachings, the Court remains confident that plaintiffs were on inquiry notice over a year before they filed their first complaint.  This conclusion is based not only on the storm warnings cited in the Court's initial opinion, but on additional warnings that the initial opinion did not discuss.

For example, unlike in Lentell, some of the articles in the financial press discussing bias and conflicts of interest expressly mentioned both defendants *and* the company in which plaintiffs invested.  On May 15, 2000, BusinessWeek published an article profiling Grubman, which specifically mentioned his work on Winstar.  See Peter Elstrom, The Power Broker: From his Wall Street Perch, Jack Grubman is Reshaping Telecom and Stirring Up Controversy, BusinessWeek, May 15, 2000, at 70.[4]  In the paragraph immediately following discussion of the positive effect that Grubman's Winstar reports had on that company's stock, the article questioned Grubman's objectivity.  "There are some academics and telecom industry insiders who say that what Grubman is doing is nothing short of scandalous," the article explained.  Id. "Critics argue that the Salomon star is turning the role of stock analyst inside out. . . . When an analyst is that entwined with a company—at times even helping to craft its strategy—questions are raised about whether it's possible to offer objective analysis."  Id.  The article cites instances in which Grubman's conflicts of interest or relationships with corporate insiders may have led

---

[4]  Plaintiffs rely on the BusinessWeek article in their complaint in order to demonstrate the influence that defendant Grubman's reports had on stock prices.  (Am. Compl. ¶ 3.)

him to alter his research analyses; quotes Grubman as disparaging the importance of "keeping [one's] distance" from the companies being researched[5]; and notes instances in which Grubman confessed to lying publicly about his personal background and academic credentials.  Id.

One year later, on May 14, 2001, Fortune magazine published an article entitled "Hear No Risk, See No Risk, Speak No Risk; How a bunch of Wall Street analysts and others hyped a company called Winstar—to death."  Bethany McLean, Fortune, May 14, 2001, at 91.[6]  The article places some of the blame for Winstar's sudden rise and fall on Grubman's "hype[]," commenting that he and others "seemed to ignore Winstar's spreading and potentially company-killing cancer, which was growing right there for all to see on Winstar's balance sheet."  Id.  The author caustically mocks both Grubman and "[a]nyone who was silly enough to follow Grubman's advice" regarding Winstar, adding that there were "oddities tucked away in

---

[5]  According to the article, Grubman found it absurd to argue that keeping distance from a company made an analyst more objective.  "'Objective?  The other word for it is uninformed,' [Grubman] snort[ed]."  Id.

[6]  The complaint does not rely on or refer to the Fortune article.  Nevertheless, it is appropriate to take judicial notice of this article, as well as other articles discussing conflicts of interest and bias on Wall Street.  See Fed. R. Evid. 201 (providing that courts may take judicial notice, whether requested or not, of facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned"); Leonard F. v. Israel Disc. Bank of New York, 199 F.3d 99, 107 (2d Cir. 1999) ("In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration 'to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, *and to matters of which judicial notice may be taken*.'") (emphasis added) (citation omitted); see also Ganino v. Citizens Utils. Co., 228 F.3d 154, 166 n.8 (2d Cir. 2000) (taking judicial notice of "well-publicized stock prices"); Cerasani v. Sony Corp., 991 F. Supp. 343, 354 n.3 (S.D.N.Y. 1998) (taking judicial notice of widespread press coverage of a criminal trial); Show-World Ctr., Inc. v. Walsh, 438 F. Supp. 642, 655 (S.D.N.Y. 1977) (taking judicial notice of newspaper articles, as well as statements made in a newspaper editorial).  It should be emphasized, of course, that the Court does not accept the articles as evidence of the truth of the matters therein asserted.  The Court takes judicial notice only of the fact that the articles were published, and that regardless of whether they were accurate, their evident purpose and immediate effect was to raise questions about objectivity and bias on Wall Street firms generally, at SSB specifically, and with particular reference to Winstar.

Winstar's New Age books that might have troubled analysts less engaged in cheerleading."  Id.[7]

Statements issued by Grubman himself after Winstar's collapse should also have raised concerns among reasonable investors that they likely had been defrauded.  On April 17, 2001, one day after Winstar had announced that it was contemplating bankruptcy and that Lucent had declared it in default on a major credit facility, Grubman issued a research report.  "[Winstar] did a better job growing the business than it did managing the balance sheet," Grubman explained, "and that came back to haunt [Winstar], especially with its over-dependence on Lucent. . . . We were hopeful [Winstar] would work something out with Lucent, but that doesn't appear likely . . . . "  (Am. Compl. ¶ 88.)  After a series of recent Grubman-issued reports expressing confidence in Winstar's ability to maintain funding at least through 2002, a reasonable investor would have been shocked to learn that the statements may have been based on a mere "hope[]" that Lucent and Winstar would work "something" out.  This is especially so in light of Grubman's alleged "public[] boast[ing] that his regular dialogues with Winstar management enhanced the depth and the legitimacy of his research."  (Id. ¶ 89.)   The tension between the statements may not provide sufficient basis to plead fraud with the particularity required under the Private Securities Litigation Reform Act and the federal rules, see 15 U.S.C. § 78u-4(b)(2); Fed. R. Civ. P. 9(b), but it does contribute to the circumstances suggesting a probability of fraud,

---

[7]  Not only do the BusinessWeek and Fortune articles differ considerably from the generic news stories found insufficient to create inquiry notice in Lentell, but the articles are in some respects analogous to publicity which the Second Circuit found *sufficient* to create inquiry notice in an even more recent case.  See Shah v. Meeker, 435 F.3d 244 (2d Cir. 2006).  Reaffirming that "[i]nformation contained in articles in the financial press may trigger the duty to investigate," the Court found that a Fortune magazine article triggered a duty to inquire because it "set forth . . . specifically" the defendant's "lack of objectivity and independence with respect to her stock analysis" and "described in great detail how her divided loyalties in fact affected her analytical reports . . . ."  Id. at 249-50.

such that investors had a duty to inquire.  See Lentell, 396 F.3d at 168.

In sum, taking together the facts noted in this opinion and those discussed in the Court's original dismissal, by May 14, 2001, the storm warnings available to a reasonable investor included, at a minimum, the following: (1) a dramatic drop in Winstar's stock price, followed by the company's collapse and bankruptcy, despite consistent highly positive reports from defendants; (2) defendants' adamant refusal to alter or qualify meaningfully their optimistic stance on Winstar despite a slew of negative reports from analysts at other firms; (3) a "flood[]" of stories in the financial press "about pervasive conflicts of interest between research and investment banking at major Wall Street firms, including SSB, and the incentives that such conflicts created for analysts, including Grubman specifically, to adopt a more optimistic attitude about certain stocks," In re Salomon Analyst Winstar Litig., 373 F. Supp. 2d at 246-47; (4) articles in BusinessWeek and Fortune that referred specifically to Grubman's positive ratings of Winstar and that together raised serious questions about his objectivity and the general propriety of his approach to conflicts of interest present in his line of work; (5) a statement by Grubman in the above-cited BusinessWeek article in which he mocked the importance of objectivity; and (6) at least one statement issued by Grubman after Winstar's downfall that is in tension, if not direct contradiction, with his prior reports.  Whether or not any of these facts or statements taken in isolation would have been sufficient to give rise to inquiry notice, the circumstances as a whole should have alerted reasonable investors in Winstar—by May 14, 2001, at the latest[8]—to the probability that they had been defrauded.

_____

[8]  The Court's original opinion charged plaintiffs with notice of their claims as of April 18, 2001. In re Salomon Analyst Winstar Litig., 373 F. Supp. 2d at 247.  On reconsideration in light of Lentell, the Court now concludes that it is more appropriate to charge plaintiffs with notice as of May 14, 2001, the date on which the Fortune article was published.

It should be emphasized that the question is *not* whether these storm warnings were sufficient to create actual knowledge of facts giving rise to a securities violation. Nor is the question whether plaintiffs would have obtained actual knowledge of sufficient facts to plead fraud with particularity within the limitations period if they had commenced an inquiry by May 2001. Rather, the question is merely whether the storm warnings were sufficient to create a duty of inquiry, and there is no question that they were.[9] Because plaintiffs conceded that they did not begin an inquiry when these storm warnings appeared, the Court's original opinion was correct in imputing actual knowledge to plaintiffs as of the date the duty to inquire arose. See Lentell, 396 F.3d at 168. Accordingly, the Court reaffirms its holding that plaintiffs' claims are barred under the applicable statute of limitations. See In re Salomon Analyst Winstar Litig., 373 F. Supp. 2d at 247-48.

III. Motion for Leave to Amend.

Plaintiffs seek leave to amend the consolidated amended complaint in order to add four paragraphs alleging facts related to plaintiffs' investigative efforts subsequent to April 2001. "Leave to amend should be freely granted, but the district court has the discretion to deny leave if there is a good reason for it, such as futility, bad faith, undue delay, or undue prejudice to the opposing party." Jin v. Metropolitan Life Ins. Co., 310 F.3d 84, 101 (2d Cir. 2002), citing Foman v. Davis, 371 U.S. 178, 182 (1962). Here, plaintiffs' motion will be denied on the bases of undue delay and futility.

---

[9] Plaintiffs thus misstate the standard when they argue that various storm warnings alleged by defendants were insufficient because the warnings "did not adequately disclose" the fraud. (P. Mem. Opposition to Motion to Dismiss at 20.) The question is not whether the storm warnings actually "disclose[d]" the fraud, but whether the circumstances were enough to "suggest" a "probability" of fraud to an investor of ordinary intelligence. Lentell, 396 F.3d at 168 (citation and internal quotation marks omitted).

A.  <u>Undue Delay</u>

The proposed amendments to the complaint seek to overcome the Court's prior ruling on inquiry notice by alleging that plaintiffs diligently commenced an investigation into fraud in response to the storm warnings as early as April 2001.  Plaintiffs have failed to explain adequately, however, why they did not attempt to plead these allegations until January 24, 2005. <u>See</u> <u>Creswell v. Sullivan & Cromwell</u>, 922 F.2d 60, 72 (2d Cir. 1990) ("The burden is on the party who wishes to amend to provide a satisfactory explanation for the delay, and the court is free to conclude that ignorance of the law is an unsatisfactory excuse." (citations omitted)). Plaintiffs had been on notice for months that their pleadings were deficient: In December 2003, defendants moved for dismissal on statute-of-limitations grounds (D. Mem. Motion to Dismiss at 11-17), and in March 2004, defendants specifically argued in their reply brief that plaintiffs' complaint failed to allege any investigation in response to the storm warnings (D. Motion to Dismiss Reply at 6-7); <u>see</u> <u>Krantz v. Prudential Invs. Fund Mgmt. LLC</u>, 305 F.3d 140, 144 (3d Cir. 2002) ("A District Court has discretion to deny a plaintiff leave to amend where the plaintiff was put on notice as to the deficiencies in his complaint, but chose not to resolve them."); <u>In re Eaton Vance Mut. Funds Fee Litig.</u>, 403 F. Supp. 2d 310, 319 (S.D.N.Y. 2005) ("In light of the plaintiffs' failure to cure the defects after being provided notice, this is not a case where leave to amend should be given because 'justice so requires.'" (citation omitted)).

Furthermore, the Court finds it significant that plaintiffs did not move to add the inquiry allegations until after the Court rendered judgment.  <u>See</u> <u>State Trading Corp. of India, Ltd. v. Assuranceforeningen Skuld</u>, 921 F.2d 409, 418 (2d Cir. 1990) (noting that where a party has had an earlier opportunity to move for leave to amend, but has waited until after judgment, "the court may exercise its discretion more exactly").  In light of the fact that plaintiffs have long been

on notice of the deficiencies in their pleadings, and that they delayed submission of the proposed amendment until after judgment and without any reasonable explanation for the delay, the Court finds it inappropriate to allow leave to amend.

Finally, it should be noted that this is not merely a case in which plaintiffs omitted certain allegations from their complaint, however negligently, and then sought leave to amend to add the omitted facts, however belatedly. As pointed out above, in defending their complaint against defendants' initial motion to dismiss, plaintiffs affirmatively represented to the Court that they had *not* made precisely the inquiry they now allege they made. In response to motion papers that expressly argued that plaintiffs were on inquiry notice no later than April 18, 2001, plaintiffs not only failed to point out that they purportedly had taken action to commence such an inquiry, or to seek to amend their complaint to add such allegations, but they expressly stated that they began their inquiry more than a year later, "[u]pon learning of the NASD probe" on July 18, 2002. (P. Mem. Opposition to Motion to Dismiss at 20.) See supra at 4 & n.3. Having made such a representation to the Court, plaintiffs may not now amend their complaint to assert contrary facts. Pleading is not a game, in which plaintiffs can first assert one set of facts, and defend a motion to dismiss on legal theories based on those facts, and then, when unsuccessful, amend the complaint to assert contrary facts and legal theories derived therefrom. See State Trading Corp. of India, 921 F.2d at 418 ("[A] busy district court need not allow itself to be imposed upon by the presentation of theories seriatim." (citation and internal quotation marks omitted)).

B. Futility

The Court's original dismissal of plaintiffs' claims called into doubt whether plaintiffs had pled scienter with sufficient particularity to survive a motion to dismiss, though the Court

13

did not render a definitive holding on that question.  In re Salomon Analyst Winstar Litig., 373

F. Supp. 2d at 244-45, 248 n.2.  As it was unnecessary to resolve these doubts to dispose of the

case, the Court adopted the usual principle of avoiding unnecessary dictum and rested its

decision solely on the statute of limitations issue.  Now, in view of the time that has elapsed due

to the need to re-examine the inquiry notice issue in light of Lentell, and in view of plaintiffs'

motion to amend their complaint, it appears prudent to resolve definitively the sufficiency of

plaintiffs' pleadings, to avoid the necessity of piecemeal appeals that, if the Court's conclusions

are in error, would delay reaching the merits of the case for years.  Thus, upon reconsideration of

the issue, the Court now holds that plaintiffs' failure to plead scienter with the requisite

particularity provides an additional, independent basis for dismissing their complaint, and

renders futile plaintiffs' motion to amend their complaint with respect to the statute of

limitations.

Under well-established standards, a complaint alleging securities fraud cannot survive

unless it alleges particularized facts that either "constitute strong circumstantial evidence of

conscious misbehavior or recklessness" or that "show that defendants had both motive and

opportunity to commit fraud."  Rothman v. Gregor, 220 F.3d 81, 90 (2d Cir. 2000).  Regardless

of which of these avenues plaintiffs choose to demonstrate scienter, the law requires that the

complaint "state with particularity [the] facts giving rise to a *strong inference* that the defendant

acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2) (emphasis added)[10]; see also

---

[10]  Section 78u–4 applies to all of plaintiffs' claims.  See 15 U.S.C. § 78u–4(b)(2) (providing that the heightened pleading requirements for scienter apply to "any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind").

Fed. R. Civ. P. 9(b).[11]

## 1. Conscious Misbehavior

In order to succeed on their claim that defendants engaged in conscious misbehavior by deliberately misrepresenting their opinions regarding Winstar, plaintiffs "must allege with particularity provable facts to demonstrate that [defendants'] statement[s] [were] both objectively and subjectively false." In re Salomon Analyst AT&T Litig., 350 F. Supp. 2d 455, 465-66 (S.D.N.Y. 2004) (citation and internal quotation marks omitted). "It is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, not borne out by subsequent events, or any other characterization that relies on hindsight or falls short of an identifiable gap between the opinion publicly expressed and the opinion truly held." Id. at 466.

As noted in the Court's initial dismissal, "plaintiffs here offer little but conclusory assertions of falsehood to support their claim that [defendants] affirmatively lied about [their]

_____

[11] It is incumbent upon the court, even when considering a motion to dismiss, to determine whether the facts pleaded by plaintiffs support the inferences that plaintiffs wish the court to draw. As Judge Marrero has explained:

> By placing a higher premium on particularity in plaintiffs' assertions of fraud, exacting a stricter standard of pleading scienter and thereby raising the stakes on Rule 12(b)(6) motions to dismiss, the [Private Securities Litigation Reform Act] also imposes a relatively higher burden on the court in securities fraud actions to render judgment at the pleading stage of a case . . . . [T]he quantum of allegations specifying fraud must be sufficiently factual and particular to pass muster . . . . And substantively, linked together contextually and weighed with reasonable inferences drawn in plaintiffs' favor, the facts pleaded must point strongly to an inference that defendants harbored intent to deceive, manipulate or defraud.

In re Livent, Inc. Noteholders Secs. Litig., 151 F. Supp. 2d 371, 424 (S.D.N.Y. 2001).

true opinion on Winstar in [the] published reports on the company."  In re Salomon Analyst

Winstar Litig., 373 F. Supp. 2d at 244.  The complaint alleges over fifteen times, for example,

that defendants' statements about Winstar were misleading because they failed to reveal that the

"reports, price targets, and 'buy' recommendations did not reflect analysts' true opinion of

Winstar."  (Am. Compl. ¶ 33; see also id. ¶¶ 39, 41, 43, 45, 47, 49, 53, 57, 59, 63, 72, 75, 76, 80,

83.)  Plaintiffs fail, however, to allege with particularity any facts giving rise to a strong

inference that such allegations are true.  While the complaint contains multiple factual

allegations suggesting (1) that defendants may have deliberately misrepresented their opinions

regarding some stocks, in part to provide favorable coverage to SSB's investment banking

clients and thereby boost their own personal compensation (see, e.g., Am. Compl. ¶¶ 126, 127,

130, 131, 133, 140, 150, 163, 169 & n.10); and (2) that defendants were aware, after Winstar's

collapse, that they had committed egregious errors in their analyses of that company and needed

to be more careful in the future (see, e.g., Am. Compl. ¶¶ 71, 88, 90, 91, 92), the complaint does

not present particularized facts creating a strong inference that defendants knowingly misstated

their true beliefs regarding *Winstar* or that they otherwise engaged in conscious misbehavior

connected to their *Winstar* recommendations.[12]

The complaint's reference to a press release by the National Association of Securities

Dealers ("NASD") might present a closer call.  As the complaint explains, the NASD issued a

_____

[12]  Plaintiffs attempt to rely on an email written by Grubman in which he sought punishment for a
technical analyst who had downgraded Winstar's technical rating.  (Am. Compl. ¶ 35.)
However, as this Court noted in a related case, "nothing in the email gives the slightest
indication that Grubman thought the technical analyst was correct.  At best the email supports an
inference that Grubman wanted to control any statement by SSB on the stocks he covered, to
assure that they accorded with his own expressed views."  In re Salomon Analyst Level 3 Litig.,
373 F. Supp. 2d 248, 251 (S.D.N.Y. 2005).

press release on September 23, 2002, to announce a settlement with SSB.  The press release

refers to an allegation in the NASD's complaint against SSB that Grubman and Gochuico "were

publicly recommending Winstar to investors [while] express[ing] contrary views in private."

(Am. Compl. ¶ 183.)  As an initial matter, the Court doubts that plaintiffs may satisfy the

requirement that they plead particularized facts constituting "strong circumstantial evidence" of

scienter, Rothman, 220 F.3d at 90, simply by parroting the NASD's unproven allegations,

particularly in light of the fact that the press release does not reveal the specific provision or

standard under which defendants' statements were judged by the NASD to be misleading.[13]

More importantly, however, the complaint reveals that the factual basis for the NASD's

accusations consisted of statements that this Court considers insufficient under federal securities

law to create a strong inference of conscious misbehavior.

In order to demonstrate that defendants Grubman and Gochuico expressed private views

about Winstar that were contrary to their public representations, the NASD press release cites (1)

Gochuico's alleged statement that the Winstar target price of "$50 per share is shall we say—

extremely aggressive"; (2) Gochuico's alleged statement that the analysts were unwilling to

change the target price because of "optics"; and (3) alleged recommendations made by

defendants "[p]rivately telling others to sell at prices far below the $50 target price."  Whether

taken together or in isolation, these statements do not create an inference, much less a strong

inference, that defendants purposefully misrepresented their private views regarding the value of

Winstar shares.  An acknowledgment that a target price is "extremely aggressive," for example,

is not by any means a confession of falsity.  Moreover, the unexplained and uncontextualized

_____

[13]  Though SSB settled with the NASD, the press release indicates that SSB did not admit to the NASD's allegations.

acknowledgment that "optics" affected a target price is simply too vague to create a strong inference of the specific wrongdoing alleged by plaintiffs. Finally, to the extent that the recommendations to sell below $50 refer to emails sent by Gochuico, the record reveals that those were *short-term* recommendations, and are thus not inconsistent with a target price of $50. (See Rosen Decl. Ex. 26.) If the plaintiffs are relying on emails other than the Gochuico emails, they fail to plead with sufficient particularity because they do not provide any details whatsoever about such correspondence.

Research reports drafted in early April 2001 might also present a close call. According to the complaint, Grubman and Gochuico drafted negative statements about Winstar on April 3 and April 6, 2001, but failed to publish those statements. (Am. Compl. ¶¶ 79-84.) Plaintiffs allege that defendants' failure to release the statements demonstrates that defendants held views contrary to their public recommendations, and that defendants "intentionally misled investors by failing to issue any ameliorative announcements to correct their earlier" research. (Am. Compl. ¶ 81.) While the unpublished drafts certainly raise an eyebrow when considered in hindsight, they do not support an inference of conscious misbehavior. First of all, defendants drafted the negative statements two weeks after disseminating the *last* of their optimistic Winstar reports, and two days after Winstar's public troubles reached new heights (with its stock reaching new lows). Second, plaintiffs do not allege that the statements were ever presented to anyone, even privately, as a representation of defendants' true views. Thus, the most that the drafts can prove is that two weeks after releasing the last of their positive Winstar reports, defendants considered, but decided against, revising their opinions about Winstar in light of its recent troubles. The drafts do not, however, demonstrate a gap between private and public views. In other words, because the decision not to publish could well have been motivated by defendants' ultimate

conclusion that they continued to be optimistic about Winstar, both publicly and privately, the unpublished drafts do not contribute to a strong inference of conscious wrongdoing.  Defendants' failure to publish may have been "unreasonable, irrational, [and] excessively optimistic," In re Salomon Analyst Level 3 Litig., 350 F. Supp. 2d 477, 489 (S.D.N.Y. 2004), particularly in hindsight, but this is insufficient to plead scienter.  See id.

In response to the Court's suggestion in its original order of dismissal that plaintiffs had failed to allege Winstar-specific facts demonstrating deliberate falsehoods, the Memorandum of Law in Support of Plaintiffs' Motion for Reconsideration focuses the Court's attention on a single February 2001 email written by defendant Gochuico, in which she acknowledged that funding "is an issue" for Winstar.  As defendants correctly respond, however, this statement is not inconsistent with defendants' published reports on Winstar, because three separate reports published between January and March of 2001 disclosed risks associated with Winstar's funding.  (Am. Compl. ¶¶ 56, 68, 69, 76; Rosen Decl. Exs. 9, 10, 11.)  The January 2001 report, for example, conceded that there were restrictions on financing from Lucent, and proceeded to describe the nature of those restrictions.  (Rosen Decl. Ex. 9 at 2.)  Defendants had also described at least some of the restrictions in an October 17, 2000, report.  (Am. Compl. ¶ 48.)

2. Motive and Opportunity

Even if plaintiffs cannot allege facts giving rise to a strong inference of conscious misbehavior, they can withstand a motion to dismiss based on failure to allege scienter if they adequately "allege facts to show that defendants had both motive and opportunity to commit fraud."  Rothman, 220 F.3d at 90.  To demonstrate motive and opportunity, plaintiffs "must allege a likelihood that defendants could realize 'concrete benefits'" through their deception. Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 100 (2d Cir. 2001)

(citation omitted); see Novak v. Kasaks, 216 F.3d 300, 307-08 (2d Cir. 2000). Plaintiffs fail to satisfy this standard.

In their brief opposing defendants' motion to dismiss, plaintiffs call attention to various allegations in their complaint that, in their view, demonstrate motive for fraud. Most of these allegations, however, are not Winstar-specific, and thus are not sufficiently particularized to withstand a motion to dismiss. For instance, plaintiffs refer to an SSB seminar at which SSB officers allegedly instructed analysts that they would benefit financially from issuing positive reports on the firm's investing banking clients. (See, e.g., P. Mem. Opposition to Motion to Dismiss at 30-31, citing Am. Compl. ¶¶ 126-29.) There is no indication in the brief or complaint, however, of any discussion of Winstar at the seminar. While some of the other examples of supposed "concrete benefits" refer specifically to Winstar, the complaint does not provide the factual basis for plaintiffs' belief that the concrete benefit would in fact inure to defendants. For example, the complaint alleges that Grubman and Gochuico had a motive to issue false and misleading research about Winstar "because their compensation would rise in direct proportion to the investment banking fees that SSB derived from Winstar." (Am. Compl. ¶ 174.) The complaint does not, however, provide a sufficient factual basis for inferring that Grubman and Gochuico's compensation was tied to banking fees received by SSB's investment banking division from Winstar. See In re Salomon Analyst AT&T Litig., 350 F. Supp. 2d at 467.

Finally, to the extent plaintiffs' "motive" claim is based on the general allegation that defendants had an incentive to issue positive Winstar reports in order to maintain and bolster the relationship between Winstar and SSB's investment banking division, and thereby improve their own compensation, the complaint also fails because the alleged "concrete benefit" is too

generalized.  As Judge Pollack held in <u>In re Merrill Lynch & Co., Inc. Research Reports</u>

<u>Securities Litigation</u>, 289 F. Supp. 2d 416 (S.D.N.Y. 2003), "[a]llegations that defendants sought

to attract investment banking business from companies for which they issued reports and that [a

defendant analyst] sought to increase his bonus compensation are insufficient as a matter of law

to establish concrete and personal benefits."  <u>Id</u>. at 428.  "If [courts] were to accept [such]

allegations of scienter as adequate," Judge Pollack correctly observed, "it would essentially read

the scienter element out of existence," because "[a]ll firms in the securities industry want to

increase profits and all individuals are assumed to desire to increase their compensation."  <u>Id</u>.;

<u>see</u> <u>also</u> <u>Kalnit v. Eichler</u>, 264 F.3d 131, 139-40 (2d Cir. 2001) (discussing cases in which

motives were found to be too generalized to warrant a strong inference of fraudulent intent); <u>In</u>

<u>re Salomon Analyst AT&T Litig.</u>, 350 F. Supp. 2d at 466 ("[G]eneralized allegations about

conflicts of interest, incentives to increase compensation, or internal pressure on analysts that is

not tied to the particular stock at issue are not sufficient, standing alone, to satisfy the

particularity requirements."); <u>cf</u>. <u>Novak</u>, 216 F.3d at 307 ("Plaintiffs could not proceed based on

motives possessed by virtually all corporate insiders . . . .").[14]

---

[14]  Plaintiffs also allege motive based on a loan to Winstar issued by SSB's corporate affiliate, Citicorp.  Citicorp, like SSB, was a subsidiary of Citigroup. "In May of 2000," the complaint alleges, "Citicorp . . . was among a group of banks that loaned Winstar $1.15 billion. Defendants, by issuing favorable research about the Company, could buoy Winstar stock; thereby facilitate its survival; and, ultimately, better the odds that the Company would repay its debt to Citicorp."  (Am. Compl. ¶ 175.)  Even if this reasoning were not overly attenuated, the allegation would be insufficient to create an inference of motive because it does not even specify how much Citicorp lent; it only claims that Citicorp was "among a group of banks" loaning $1.5 billion. (<u>Id</u>.)

3. <u>Recklessness</u>

As noted above, plaintiffs alleging securities fraud may prevail without alleging conscious misbehavior (and without alleging "motive and opportunity") if they adequately allege that plaintiffs recklessly made materially misleading statements. "Recklessness" in the federal securities law context refers to "'highly unreasonable'" conduct, "representing 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to [defendants] or so obvious that [defendants] must have been aware of it.'" <u>Rothman</u>, 220 F.3d at 90 (first alteration in original) (citation omitted). Thus, plaintiffs' claim might survive if their complaint adequately alleges that defendants' actions were "highly unreasonable" and that defendants knew—or "must have been aware"—of the "danger" that their optimistic predictions would not pan out. The Court concludes, however, that plaintiffs cannot succeed on this theory, because (1) to the extent plaintiffs allege that defendants were reckless in making optimistic *prospective* statements, their claims are barred under the "bespeaks caution" doctrine, and (2) to the extent plaintiffs allege reckless misrepresentation of *present or historical* facts, the complaint does not plead particularized facts creating a strong inference of recklessness.

The "bespeaks caution" doctrine precludes fraud liability for positive forward-looking statements that are accompanied by sufficient "cautionary language or risk disclosures" which, taken in context, "bespeak caution" to the reader. <u>In re Salomon Analyst Level 3 Litig.</u>, 350 F. Supp. 2d at 494, quoting <u>Spencer Trask Software v. RPost Int'l Ltd.</u>, 02 Civ. 1276 (PKL), 2003 WL 169801, at *22 n. 16 (S.D.N.Y. Jan. 24, 2003); <u>see also</u> <u>Halperin v. eBanker USA.com, Inc.</u>, 295 F.3d 352, 357-59 (2d Cir. 2002). The defense is generally available where the cautionary language explicitly warns of or directly relates to the risk that brought about a plaintiff's loss. <u>Id</u>. at 359. "The touchstone of the inquiry is not whether isolated statements within a document

were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." Id. at 357. Here, the prospective representations in defendants' research reports, "considered together and in context," could not have "misled a reasonable investor regarding the nature of the securities" at issue, because the reports contained sufficient cautionary language and risk disclosures that related directly to the risks that brought about plaintiffs' losses. Id. at 357.

Plaintiffs complain that defendants' optimistic prospective statements were reckless because they failed to take into account or properly disclose various dangers relating to Winstar's financial health and ability to maintain funding. The complaint repeatedly alleges, for example, that defendants' reports should have disclosed or better emphasized that "Winstar was a company which had never been profitable"; that the company had suffered "substantial operating losses"; that it was heavily dependent on external financing; that the possibility of obtaining adequate financing was uncertain at best; and that Winstar's ability to maintain a customer base was a very speculative matter. (Am. Compl. ¶ 32; see also id. ¶¶ 39, 41, 43, 45, 47, 49, 53, 57, 59, 63, 72, 75, 76, 80, 83.) Defendants' research reports, however, included adequate warnings of these dangers. As defendants note, for example, the reports consistently included data indicating that Winstar had negative earnings per share for all the preceding quarters. (Rosen Decl. Exs. 4, 5, 6, 7, 8, 9, 10, 11, 14, 15.) The reports also consistently reported long-term debt-to-capital ratios exceeding 100%—with the ratio reaching almost 140% in early March 2001—as well as a projected long-term earnings-per-share growth of 0%. (See, e.g., id. Exs. 9, 10, 11, 14, 16.) All of this information appeared on the first page of the reports. Moreover, the reports on Winstar consistently rated the company as "speculative" (see, e.g., id.

23

Exs. 6, 7, 8, 9, 10, 11, 14, 18), with the rating "speculative" expressly defined in some reports as designating a company with "very low predictability of fundamentals and a high degree of volatility, suitable only for investors/traders with diversified portfolios that can withstand material losses"[15] (id. Ex. 4 at 24.). Other reports, including a November 17, 2000, report, described specific dangers related to "increased competition" and "difficulty in obtaining roof rights upon which [Winstar's] radios may be installed," warning that "Winstar is suited for those investors with a high risk tolerance." (Id. Ex. 16, at 3; see also id. Ex. 17, at 3.) Moreover, almost three months before Winstar announced that it was in default of a major credit facility with Lucent, defendants' reports began to include additional cautionary language with regard to external funding risks, including references to the restrictions on the Lucent credit facility. The January 25, 2001, report warned that "[t]here are restrictions on [Winstar's] vendor financing from [Lucent] . . . which should not be new news to investors." (Id. Ex. 9, at 2.) Reports issued in February and March 2001 cautioned that Winstar needed to raise "$1.0 - $1.5 billion . . . in order to get them to free cash flow positive by 2004." (Id. Ex. 10 at 2; see also id. Ex. 11 at 2.)[16]

Plaintiffs' contention that "there was no reasonable good faith basis to conclude with confidence that Winstar was fully funded" (Am. Compl. ¶ 32) also misrepresents the reports at issue, because the reports clearly disclose the basis for defendants' claim that Winstar was fully funded. The December 16, 1999 report, for example, states that Winstar had announced receipt

_____

[15] The fact that some reports contained fewer cautionary words than others does not preclude defendants from relying on the "bespeaks caution" defense. See In re WorldCom, Inc. Secs. Litig., 294 F. Supp. 2d 392, 410-11 (S.D.N.Y. 2003) ("The 'bespeaks caution' doctrine instructs courts to consider the *'total mix' of information available* to a reasonable investor to determine whether cautionary language in a document would have prevented an investor from being misled." (emphasis added) (citation omitted)).

[16] A few weeks before Winstar's bankruptcy, Grubman also issued an "SSB global report" noting that Winstar's "funding gap remains a risk." (Am. Compl. ¶ 83.)

of a $900 million investment; the report then explains that "[w]ith this investment Winstar is fully funded to 2003." (Am. Compl. ¶ 31.) The report was careful not to claim that the financing risk was eliminated, saying only that the risk was "greatly reduced." (Id.) An October 17, 2000, report made clear that Winstar had received a $2 billion credit facility from Lucent, and explained that "[i]f one assumes the [Winstar] will be able to utilize the full $2 billion credit facility, then the company is funded until mid-2001." (Am. Compl. ¶ 48.)[17] Considering all the circumstances, plaintiffs cannot prevail on a claim that defendants recklessly failed to disclose the lack of a reasonable basis for optimistic statements regarding Winstar's future funding if defendants' reports plainly disclosed the basis for their statements.

Moreover, defendants repeatedly alerted investors to reports issued by other analysts, who were recommending *against* investment in Winstar due to insufficient cash flow, serious default concerns, and other problems. Defendants did not merely refer to these reports; they quoted them and discussed them at length in their own reports on Winstar. (Am. Compl. ¶¶ 56, 65; see Rosen Decl. Exs. 9, 11.) While the contrary reports may not be sufficient standing alone to bespeak caution of the risks haunting Winstar—primarily because defendants worked so aggressively to discredit the reports' authors and conclusions[18]—the reports are nevertheless

---

[17] The report also specifically described the limits imposed on the $2 billion credit facility. (Am. Compl. ¶ 48).

[18] On the other hand, any reasonable investor would also have noted that despite defendants' strong disagreement with the negative reports, defendants did not categorically deny all of the reports' claims. Responding to one report that Winstar was suffering large losses, for example, defendants merely stated that the report regarding losses did not present "new news," did "not paint a complete picture," and contained "some inaccuracies." (Rosen Decl. Ex. 11.) Given defendants' unwillingness to refute with more force the negative reports' factual claims regarding Winstar's losses, any reasonable investor would have been on notice that, even if defendants genuinely had hope for Winstar's future, there was a solid basis for disagreement on the matter.

relevant to the "bespeaks caution" inquiry because they form part of the total mix of Winstar-related information provided to investors by defendants.  See In re WorldCom, Inc. Secs. Litig., 294 F. Supp. 2d at 410-11.  No reasonable investor would have failed to take note, for example, of competing analysts' claims—quoted in defendants' research reports—that Winstar "may not be as well funded as many believe" and was likely to lose two billion dollars in a two year period.  Nor would a reasonable investor fail to take into account defendants' acknowledgment, made in November 2000 and March 2001, that of the four competitive local exchange carriers they most highly recommended, "Winstar is the one on which we get the most pushback."  (Am. Compl. ¶ 74; Rosen Decl. Ex. 14.)[19]

Plaintiffs' primary response to defendants' "bespeaks caution" defense is to argue that nothing in the reports cautioned investors that defendants' "buy" recommendations were not genuinely believed.   In other words, while the reports contained some cautionary language, that language did not relate directly to the risk that defendants were making "buy" recommendations in bad faith.  The Court agrees that defendants' reports did not warn of this risk, and that the "bespeaks caution" defense might be unavailable to the extent plaintiffs' claims rest on the allegation that defendants deliberately uttered falsehoods.  See In re Salomon Analyst Level 3 Litig., 350 F. Supp. 2d at 494-95 (holding that where plaintiffs alleged their losses resulted from Grubman's conscious misrepresentation of his opinion, "the 'risk' that would have to be 'disclosed' or cautioned against in order for [his] reports to be non-actionable under [the

_____

[19]  Moreover, in light of defendants' clear disclosure of the contrary views held by competing analysts, no reasonable investor would have failed to examine for him or herself the competing analysts' reports.  One of those reports, which is quoted at length in plaintiffs' original complaint, contains a scathing, detailed denunciation of Winstar, arguing that the company was losing money, had no free cash flow, and lacked sufficient cash or credit to cover losses and expenses.  (Original Complaint ¶ 46.)

'bespeaks caution' doctrine] [was] the risk that Grubman's Buy recommendation was not true,"
i.e., the risk that he did "not truly believe that suitably risk-seeking investors should buy" the
stocks in question). That issue need not be resolved here, however, because the claims based on
conscious wrongdoing have already been dismissed for the independent reason that plaintiffs'
complaint does not plead conscious misbehavior with the requisite particularity. See supra Part
III.B.1. The "bespeaks caution" doctrine is addressed here only with respect to the claim that
defendants were reckless in releasing optimistic prospective statements. Simply put, plaintiffs
fail to state a claim for recklessness based on those prospective statements, because even if the
dangers attending investment in Winstar were "so obvious that [defendants] must have been
aware" of them when the optimistic statements were made, see Rothman, 220 F.3d at 90
(describing standard for recklessness), the multiple risk disclosures in defendants' reports were
sufficient to ensure that reasonable investors would have been aware of those dangers as well.

    The "bespeaks caution" defense does not, of course, protect defendants from liability for
reckless misrepresentations of present or historical facts, as opposed to forward-looking opinions
or other prospective representations. See P. Stolz Family P'ship L.P. v. Daum, 355 F.3d 92, 96-
97 (2d Cir. 2004). However, to the extent plaintiffs attempt to rely on reckless
misrepresentations or omissions relating to present or historical facts, they do not plead scienter
with the requisite particularity.

    As noted, plaintiffs claiming recklessness must allege, "at the least, conduct which is
'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary
care . . . to the extent that the danger was either known to the defendant or so obvious that the
defendant must have been aware of it.'" Novak, 216 F.3d at 308 (alteration in original) (citation
omitted). None of the alleged misrepresentations of present or historical facts come close to

meeting this standard, primarily because plaintiffs do not allege facts suggesting that plaintiffs

knew or should have known that their statements were misleading at the time the statements

were made.  Nor do plaintiffs adequately allege that defendants even had access to specific

information that contradicted defendants' public statements or that otherwise rendered those

statements misleading.  See id. at 309 (explaining that "[w]here plaintiffs contend defendants had

access to contrary facts, they must specifically identify the reports or statements containing this

information" in order to sustain a claim of recklessness); San Leandro Emergency Med. Group

Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 812 (2d Cir. 1996) ("Plaintiffs'

unsupported general claim of the existence of confidential company sales reports that revealed

the larger decline in sales is insufficient to survive a motion to dismiss.").

Plaintiffs complain, for example, that defendants failed to disclose that certain features of

Winstar's business model made it heavily dependent on repeated debt offerings and

"uncommonly sensitive to the traditionally volatile capital markets."  (Am. Compl. ¶ 14.)

However, the complaint does not allege that there is concrete documentation showing that

plaintiffs' assessment is correct or, more importantly, that defendants knew the allegedly

relevant facts.[20]   Plaintiffs also claim that defendants twice overstated Winstar's cash position

by over $200 million (Am. Compl. ¶¶ 59-61), but they fail to allege any facts showing that

defendants were aware of the alleged overstatement at the time it was made, or that the error was

"so obvious that [defendants] should have been aware of it."  Rothman, 220 F.3d at 90.[21]

---

[20]  Moreover, defendants did, at least in general terms, warn investors that Winstar could be a
volatile stock.  (See, e.g., Rosen Decl. Ex. 4 at 24.)

[21]  Though the Court need not examine this particular issue further, given plaintiffs' failure to
plead sufficient facts, it is worth noting that evidence in the record suggests that defendants did
not in fact overstate Winstar's cash position at all. (See D. Mem. Motion to Dismiss at 21 n.18.)

With respect to defendants' public disagreement with, and downplaying of, present and historical information presented by competing analysts in their negative reports about Winstar, see supra Part III.B.1., plaintiffs' alleged facts again fail to raise a strong inference of recklessness. (See, e.g., Am. Compl. ¶¶ 56, 65; Rosen Decl. Exs. 9, 11.) This is because plaintiffs do not identify with particularity any materially important present or historical information in the negative reports that (1) was actually known by defendants to be true or so obviously true that defendants must have known its truth, *and* (2) was recklessly denied, contradicted or omitted by defendants in their own reports despite defendants' contemporaneous awareness of the information's truth. At most, plaintiffs have alleged facts showing that there was a diversity of opinion about Winstar's value and prospects, and that—when considered in light of subsequent developments—defendants' assessments were woefully off-base. But the mere fact that defendants were, in hindsight, unreasonable or foolish when they publicly disagreed with the negative reports' factual conclusions does not suffice to state a claim based on recklessness.[22]

Finally, the fact that defendants chose not to publish certain draft research reports with negative assessments of Winstar, see supra Part III.B.1., does not support an inference of recklessness, because plaintiffs have failed to make particularized allegations showing that when defendants decided against publication, defendants knew that the information in the drafts was true, or that the information was so obvious that defendants must have been aware of its truth.

---

[22] The Court emphasizes, moreover, that defendants' acknowledgments that Winstar was in poor financial health do not create an inference of recklessness if those statements were made *after* Winstar publicly declared bankruptcy. Thus, for example, Grubman's post-bankruptcy recognition that prior negative research reports were correct does not create, or even contribute to, an inference that he should have known those reports to be correct at the time they were made. (Am. Compl. ¶ 71.)

As discussed earlier, the decision not to publish the negative assessments may have resulted from a good-faith, reasoned (albeit incorrect) belief that the information contained therein was incorrect, overly pessimistic, or otherwise misguided. The Court will not draw inferences to the contrary absent more particularized allegations from plaintiffs.

In sum, because plaintiffs' factual allegations, "linked together contextually and weighed with reasonable inferences drawn in plaintiffs' favor," do not "point strongly to an inference that defendants harbored intent to deceive, manipulate or defraud," plaintiffs fail to state a claim for securities fraud. In re Livent, Inc. Noteholders Secs. Litig., 151 F. Supp. 2d 371, 424 (S.D.N.Y. 2001). Thus, to permit plaintiffs to amend their complaint in an effort to avoid the statute of limitations problem would be futile, as the amended complaint would still have to be dismissed for failure to state a claim.

## CONCLUSION

Plaintiffs' motion for reconsideration is granted in light of Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d Cir. 2005). For the reasons stated above, however, the Court again grants defendants' motion to dismiss the complaint. Plaintiffs' motion for leave to amend the complaint is denied.

SO ORDERED.

Dated: New York, New York
February 28, 2006.

                                             _____
                                               GERARD E. LYNCH
                                         United States District Judge.

As discussed earlier, the decision not to publish the negative assessments may have resulted from a good-faith, reasoned (albeit incorrect) belief that the information contained therein was incorrect, overly pessimistic, or otherwise misguided. The Court will not draw inferences to the contrary absent more particularized allegations from plaintiffs.

In sum, because plaintiffs' factual allegations, "linked together contextually and weighed with reasonable inferences drawn in plaintiffs' favor," do not "point strongly to an inference that defendants harbored intent to deceive, manipulate or defraud," plaintiffs fail to state a claim for securities fraud. In re Livent, Inc. Noteholders Secs. Litig., 151 F. Supp. 2d 371, 424 (S.D.N.Y. 2001). Thus, to permit plaintiffs to amend their complaint in an effort to avoid the statute of limitations problem would be futile, as the amended complaint would still have to be dismissed for failure to state a claim.

## CONCLUSION

Plaintiffs' motion for reconsideration is granted in light of Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d Cir. 2005). For the reasons stated above, however, the Court again grants defendants' motion to dismiss the complaint. Plaintiffs' motion for leave to amend the complaint is denied.

SO ORDERED.

Dated: New York, New York
February 28, 2006.

GERARD E. LYNCH
United States District Judge.